## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J. PHILLIP MAX, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) **Case No.** |
| Plaintiff, | ) ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) ) |
| NOKIA CORPORATION, RAJEEV SURI, KRISTIAN PULLOLA, and TIMO IHAMUOTILA. | ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants. | ) ) |

## CLASS ACTION COMPLAINT

Plaintiff J. Phillip Max ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Nokia Corporation ("Nokia" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Nokia's securities between

April 15, 2015 through March 21, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Nokia was founded in 1865 and is headquartered in Espoo, Finland.  Nokia engages in the network and technology businesses worldwide.  Among other things, Nokia provides hardware, software, and services for telecommunications operators, enterprises, and related markets/verticals, including public safety and Internet of Things ("IoT").  The Company also offers various networking solutions, including networking infrastructure, implementation, and optimization products and services.

3.      On April 15, 2015, Nokia announced plans to purchase Alcatel-Lucent S.A. ("Alcatel"), a French global telecommunications equipment company.  Nokia finalized the acquisition of Alcatel on November 2, 2016.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that:  (i) Alcatel maintained insufficient internal controls and was materially non-compliant in its business practices; (ii) Nokia had failed to conduct adequate due diligence into Alcatel prior to its acquisition; (iii) subsequent to the completion of Nokia's acquisition of Alcatel, the Company maintained insufficient internal controls over the integration of Alcatel's businesses; (iv) as a result of the foregoing, at all relevant times, Nokia was at risk of serious criminal and civil

penalties; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On March 21, 2019, Nokia filed its Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2018 (the "2018 20-F"), wherein the Company disclosed that it had "been made aware of certain practices relating to compliance issues" at Alcatel that raised concerns.  Nokia advised investors that it had "initiated an internal investigation and voluntarily reported the matter to the relevant regulatory authorities, with whom we are cooperating with a view to resolving the matter."

6.     Following this disclosure, the price of Nokia's American depositary receipts ("ADRs") fell $0.38 per share, or 6.07%, to close at $5.88 per share on March 22, 2019.

7.     On March 22, 2019, after market hours, Nokia issued a press release responding to the "market rumors" surrounding the March 21, 2019 disclosure (the "March 2019 Press Release").  Specifically, the March 2019 Press Release attempted to assuage investor fears regarding these issues, stating that the "investigation is not expected to have a material impact on Nokia."

8.     Despite Nokia's attempt to soothe investors in the March 2019 Press Release, the price of Nokia ADRs continued to decline over the next few trading days, falling an additional $0.19 per share from its close price on March 22, 2019, or approximately 3.23%, to close at $5.69 per share on March 28, 2019.

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Nokia securities trade on the New York Stock Exchange ("NYSE") located within this Judicial District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Nokia securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Nokia is incorporated under the jurisdiction of the Republic of Finland with its principal executive offices located at Karaportti 3 FI  02610 Espoo, Finland.  Nokia securities trade in an efficient market on the NYSE under the ticker symbol "NOK."

16.     Defendant Rajeev Suri ("Suri") has served as Nokia's President and Chief Executive Officer ("CEO") at all relevant times.

17.     Defendant Kristian Pullola ("Pullola") has served as Nokia's Chief Financial Officer ("CFO") since January 1, 2017.

18.     Defendant Timo Ihamuotila ("Ihamuotila") served as Nokia's Executive Vice President and Group CFO from September 1, 2011 to December 2, 2015, and as Nokia's CFO from December 2, 2015 to December 31, 2016.

19.     The Defendants referenced above in ¶¶ 16-18 are sometimes referred to herein collectively as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Nokia's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Nokia was founded in 1865 and is headquartered in Espoo, Finland.   Nokia engages in the network and technology businesses worldwide.   For example, Nokia provides hardware, software, and services for telecommunications operators, enterprises, and related markets/verticals, including public safety and IoT.   The Company also offers various other

networking solutions, including networking infrastructure, implementation, and optimization products and services.

22.     On April 15, 2015, Nokia announced plans to purchase Alcatel, a French global telecommunications equipment company.   Nokia finalized the acquisition of Alcatel on November 2, 2016.

**Materially False and Misleading Statements Issued During the Class Period**

23.     The Class Period begins on April 15, 2015, when Nokia issued a press release announcing the Company's plans to purchase Alcatel (the "April 2015 Press Release").   The April 2015 Press Release touted the Alcatel purchase's expected financial benefits for both Nokia and Alcatel shareholders, including, *inter alia*, the combined companies' expected "strong balance sheet, with combined net cash at December 31, 2014 of EUR 7.4 billion,"   as well "operating cost synergies," which were "expected to create a long-term structural cost advantage," including:

- Organizational streamlining, rationalisation of overlapping products and services, central functions, and regional and sales organizations

- Reduction of various overhead costs in real estate, manufacturing and supply-chain, information technology, and overall general and administrative expenses, including redundant public company costs[; and]

- Procurement given expanded purchasing requirements of the combined company[.]

24.     The April 2015 Press Release also discussed Nokia's continued due diligence of Alcatel, stating that "the remainder of 2015 will constitute a review period consisting of regulatory and merger control review in a number of jurisdictions, AMF review and other transaction approvals and reviews," and that Nokia planned "to convene an Extraordinary

General Meeting to pass the resolutions necessary to implement the combination and the public

exchange offer after the receipt of relevant regulatory approvals."

25.     Defendant Suri, President and CEO of Nokia, praised the transaction in the April

2015 Press Release, stating:

> Together, Alcatel-Lucent and Nokia intend to lead in next-generation network
> technology and services, with the scope to create seamless connectivity for people
> and things wherever they are.
>
> Our innovation capability will be extraordinary, bringing together the R&D
> engine of Nokia with that of Alcatel-Lucent and its iconic Bell Labs. We will
> continue to combine this strength with the highly efficient, lean operations needed
> to compete on a global scale.
>
> We have hugely complementary technologies and the comprehensive portfolio
> necessary to enable the internet of things and transition to the cloud.  We will
> have a strong presence in every part of the world, including leading positions in
> the United States and China.
>
> Together, we expect to have the scale to lead in every area in which we choose to
> compete, drive profitable growth, meet the needs of global customers, develop
> new technologies, build on our successful intellectual property licensing, and
> create value for our shareholders.
>
> For all these reasons, I firmly believe that this is the right deal, with the right
> logic, at the right time.

26.     On April 1, 2016, Nokia filed its Annual Report on Form 20-F with the SEC,

announcing the Company's financial and operating results for the fiscal year ended December

31, 2015 (the "2015 20-F").  For 2015, Nokia reported an operating profit of €1.7 billion, or

€0.31 per diluted share, on net sales of €12.5 billion, compared to an operating profit of €1.4

billion, or €0.67 per diluted share, on net sales of €11.8 billion for 2014.

27.     The 2015 20-F also highlighted the acquisition of Alcatel, stating, in relevant part:

> Our acquisition of Alcatel Lucent, announced in April 2015, has produced a new
> leader in next-generation technologies for the Programmable World. *It was made
> possible due to the hard work and dedication of our employees who ensured
> that we were able to close the deal in early January, 2016, faster than many*

> *thought possible.* <u>***Our integration planning has been thorough,***</u> ***allowing us to move forward as one company from January 14, 2016.***

(Emphasis added).

28.     In the "Letter from the President and CEO" included in the 2015 20-F, Defendant Suri highlighted, *inter alia*, how the Alcatel acquisition made "financial and strategic sense on every level," stating, in relevant part:

> Our acquisition of Alcatel Lucent is an industry-changing event and opens exciting new opportunities for us and our customers. ***The transaction makes financial and strategic sense on every level. It also does something more: it enables us to pursue our vision to expand the human possibilities of the connected world.*** In this rapidly approaching world, where everyone and everything will be connected, we are positioned both to do well and do good.
>
> * * *
>
> The acquisition of Alcatel Lucent, culminating in our first day of combined operations as the new Nokia on January 14, 2016, also gives us a stronger position in many regions. In North America we became the market leader; in China we are the largest vendor headquartered outside the country; in Europe, Latin America and Middle East and Africa we have roughly doubled our size.

(Emphasis added).

29.     The 2015 20-F also touted Nokia's allocation of "significant resources" to integrate Alcatel's business and post-acquisition plans, while simultaneously downplaying "potential" or "unknown" liabilities related to Alcatel because Nokia did not have, *inter alia*, "full access to Alcatel Lucent's internal records, including, but not limited to, *those related to compliance issues*" (emphasis added).

30.     The 2015 20-F also downplayed the risks associated with Alcatel's prior compliance issues relating to "actual and alleged violations of anti-corruption laws," including the U.S. Foreign Corrupt Practices Act ("FCPA"), while again touting Alcatel's remedial measures, stating, in pertinent part:

8

**We are subject to various legislative frameworks and jurisdictions that regulate fraud as well as economic and trade sanctions and policies, and as such, the extent and outcome of possible proceedings is difficult to estimate with any certainty. _Our subsidiary Alcatel Lucent has been, and continues to be, involved in investigations concerning alleged violations of anti-corruption laws, and has been, and could again be, subject to material fines, penalties and other sanctions as a result of such investigations._**

\* \* \*

**_In the past, Alcatel Lucent has experienced both actual and alleged violations of anti-corruption laws, including of the FCPA._** As a result, Alcatel Lucent has had to pay substantial amounts to the US Securities and Exchange Commission in disgorgement of profits and interest, and to the U.S. Department of Justice (the "DOJ") in criminal fines . . . . **_Alcatel Lucent worked with the Monitor to implement its recommendations, most of which were focused on strengthening the resources dedicated to the compliance organization of Alcatel Lucent Group, and on enhancing and expanding its policies and procedures_**, including those Alcatel Lucent use when Alcatel Lucent retains third parties[.]

\* \* \*

Alcatel Lucent is also subject to certain other ongoing investigations and proceedings in France and Nigeria, which may result in further material damages, fines, penalties and other sanctions, and in its inability to participate in certain public procurement agreements in those countries.

**_There can be no assurance that we would not be subject to material fines, penalties and other sanctions as a result of similar events outlined in this risk factor. Any damages, fines, penalties or other sanctions attributable to Alcatel Lucent could have a material adverse effect on our brand, reputation or financial position._**

(Emphases added).

31.     Appended as an exhibit to the 2015 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Suri and Ihamuotila certified that the 2015 20-F "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934" and that the "information contained in the [2015 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

32.     On November 2, 2016, Nokia issued a press release announcing that the Company

had finalized the acquisition of Alcatel (the "November 2016 Press Release").  The November

2016 Press Release stated that Nokia was relieved it could "start eliminating the complexity and

costs of running two separate public companies," and highlighted Nokia's "rapid" acquisition

and integration of Alcatel.  For example, the November 2016 Press Release touted how

"wrapping up a rapid purchase and integration of the company" provided "added momentum to

capture more business" given the surging demand for data; how "Nokia's fast progress in

integrating and operating as a combined company" had "put it in good stead" to meet increasing

opportunities; how "[t]his speed was evident only 9 months after the deal was announced"; how

Nokia had "accelerated synergy plans for the deal," expecting "EUR 1.2 billion in annual cost

savings to be achieved in full-year 2018"; and that Nokia "offer[ed] customers its improved

product portfolio in a fraction of the time taken in previous integrations."

33.     The November 2016 Press Release also quoted Nokia's President and CEO,

Defendant Suri, who praised Alcatel's smooth acquisition:

> While we have been operating as a combined company already since January
> 2016, we should take a moment to recognize the significance of today's news.
> This acquisition was smoother than many observers thought possible, and I would
> like to thank all our employees and partners who made it happen[.]
>
> * * *
>
> During the last three years Nokia has reinvented itself, emerging as a leader in the
> technologies connecting people and things with an unparalleled portfolio that
> better serves our traditional customers and, critically, new customers in the
> enterprise, Internet, utilities and transportation sectors.

34.     On March 23, 2017, Nokia filed its Annual Report on Form 20-F with the SEC,

announcing the Company's financial and operating results for the fiscal year ended December

31, 2016 (the "2016 20-F").  For 2016, Nokia reported an operating loss of €1.1 billion, or a loss

of €0.13 per diluted share, on net sales of €12.5 billion, compared to an operating profit of €1.7 billion, or €0.31 per diluted share, on net sales of €23.6 billion for 2015.  Nokia attributed the increase in net sales, as well as the increase in costs and expenses partially attributable to Nokia's total operating loss, to its acquisition of Alcatel.

35.     Additionally, the 2016 20-F touted the acquisition of Alcatel, noting that "[s] ince the closing of the Alcatel Lucent acquisition in early January 2016 . . . we have combined global leadership in mobile and fixed network infrastructure with the software, services and advanced technologies to serve customers in more than 100 countries around the world."

36.     In the "Letter from our President and CEO" included in the 2016 20-F, Defendant Suri highlighted the Company's "significant progress integrating Alcatel Lucent" and, after "mov[ing] forward with the execution of [Nokia's] strategy," the Company was "on track to meet [its] commitment to reduce costs by EUR 1.2 billion in full year 2018."  Suri also touted the speed of Alcatel's integration, stressing how "[d]espite having only closed the Acquisition of Alcatel Lucent in early January 2016 and gained 100% ownership on November 2, 2016, we have completed the majority of our integration projects," and that "the speed of progress and quality of work have been considerably higher than I have witnessed in past integrations."

37.     The 2016 20-F also touted Nokia's allocation of "significant resources" to integrate Alcatel, while providing merely generic, boilerplate representations regarding risks posed by its acquisition, including, *inter alia*:

- "[C]onditions and burdens imposed by laws, regulators or industry standards on our business or adverse regulatory or industry developments or litigation affecting us, as a result of the Acquisition of Alcatel Lucent or otherwise;" and

- "[P]otential unknown or larger than estimated liabilities of Alcatel Lucent (prior to the acquisition) or other adverse circumstances related to Alcatel Lucent that lead to larger than expected liabilities or have other adverse impacts on us[.]"

In addition these boilerplate representations, the 2016 20-F noted the continuing risks posed by Alcatel's prior "both actual and alleged violations of anti-corruption laws," and subsequent indictment for violations of the French Criminal Code.

38.     The 2016 20-F also identified several material weaknesses in Nokia's internal controls over financial reporting following the acquisition of Alcatel, stating, in relevant part:

> **We have identified material weaknesses in our internal control over financial reporting following the Acquisition of Alcatel Lucent which, if not remediated, could have a material adverse effect on us.**
>
> Our integration activities in connection with the Acquisition of Alcatel Lucent are ongoing. In connection with the preparation of our consolidated financial statements for the year ended December 31, 2016, our management identified two material weaknesses in the effectiveness of our internal control over financial reporting related to (1) the accounting for income taxes at a former Alcatel Lucent entity in the United States and (2) the accounting and control functions at a former Alcatel Lucent subsidiary in China.

The 2016 20-F blithely noted that Nokia may "identify further control deficiencies that are material weaknesses in the future."

39.     In addition, the 2016 20-F stated that "[a]s permitted by applicable regulations and accounting rules, Nokia's internal controls effectiveness assessment in 2016 did not include Alcatel Lucent's legacy operations."  Therefore, Nokia's "failure to integrate the Alcatel Lucent legacy operations into our internal controls framework, could adversely affect the accuracy and timeliness of our financial reporting."  Nokia noted that this could potentially lead to a "loss of confidence" in the Company or "the accuracy and completeness" of Nokia's financial reports,

"or otherwise in the imposition of fines or other regulatory measures, which could have a material adverse effect on" the Company.

40.     The 2016 20-F also contained merely generic, boilerplate representations regarding the accuracy of its due diligence investigations into Alcatel, stating, in relevant part:

> We may also be subject to claims, fines, investigations or assessments for conduct that we failed to or were unable to discover or identify in the course of performing our due diligence investigations of Alcatel Lucent prior to the acquisition, including unknown or unasserted liabilities and issues relating to fraud, non-compliance with applicable laws and regulations, improper accounting policies or other improper activities.

By way of example, Alcatel explained that "after the Acquisition of Alcatel Lucent, we identified improper conduct and related material weakness in the control environment at an Alcatel Lucent subsidiary in China[.]"

41.     Despite these challenges, the 2016 20-F touted Nokia's "systematic and structured approach to risk management across [the Company's] business operations and processes."  The 2016 20-F also stated that Nokia's "internal control over financial reporting is designed to provide reasonable assurance to the management and the Board regarding the reliability of financial reporting and the preparation and fair presentation of published financial statements." However, Nokia's "assessment of the operating effectiveness of internal controls as of year end . . . excluded the business acquired through the Acquisition of Alcatel Lucent, on January 4, 2016" as Nokia "continue[d] to integrate" Alcatel into the Company.

42.     Appended as an exhibit to the 2016 20-F were signed SOX certifications by Defendants Suri and Pullola, certifying that the 2016 20-F "fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934," and that "[t[he information contained in the [2016 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

43.     On March 22, 2018, Nokia filed its Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2017 (the "2017 20-F").  For 2017, Nokia reported an operating profit of €16 million, or a loss of €0.26 per diluted share, on net sales of €23.1 billion, compared to an operating loss of €1.1 billion, or a loss of €0.13 per diluted share, on net sales of €12.5 billion for 2016.  Nokia again attributed the increase in net sales, as well as the increase in costs and expenses, to its acquisition of Alcatel.

44.     Additionally, the 2017 20-F touted Alcatel's acquisition, stating that it had "position[ed] Nokia as an innovation leader in next-generation technology and services."

45.     The 2017 20-F also touted Nokia's allocation of "significant resources to the integration of the former Alcatel Lucent business," while providing merely generic, boilerplate representations concerning the continuing risks posed by its acquisition of Alcatel, including, *inter alia*:

- "[C]onditions and burdens imposed by laws, regulators or industry standards on our business or adverse regulatory or industry developments or litigation affecting us, as a result of the acquisition of Alcatel Lucent or otherwise;"

- "[P]otential unknown or larger than estimated liabilities of Alcatel Lucent (prior to the acquisition) or other adverse circumstances related to Alcatel Lucent that lead to larger than expected liabilities or have other adverse impacts on us;" and

- "[C]laims, fines, investigations or assessments for conduct that we failed to or were unable to discover or identify in the course of performing our due diligence investigations of Alcatel Lucent prior to the acquisition, including unknown or unasserted liabilities[.]"

46.     The 2017 20-F also noted Alcatel's prior both actual and alleged violations of anti-corruption laws, and addressed how Alcatel "had to pay substantial amounts in fines, penalties and disgorgement of profits to government enforcement agencies in the United States and elsewhere" due to FCPA violations.  However, the 2017 20-F merely contained generic, vague, and boilerplate representations regarding how Nokia "may be subject to claims, fines, investigations or assessments for conduct that [Nokia] failed to or were unable to discover or identify in the course of performing our due diligence investigations of Alcatel Lucent, including unknown or unasserted liabilities and issues relating to fraud, non-compliance with applicable laws and regulations, improper accounting policies or other improper activities."

47.     With regard to Nokia's disclosure controls and procedures, the 2017 20-F stated, in relevant part:

> Our management, with the participation of our President and CEO and our Chief Financial Officer, conducted an evaluation pursuant to Rules 13(a)-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended . . . of the effectiveness of our disclosure controls and procedures as of December 31, 2017. ***Based on such evaluation, our President and CEO and our Chief Financial Officer have concluded that our disclosure controls and procedures were effective.***

(Emphasis added).

48.     With regard to Nokia's internal control over financial reporting, the 2017 20-F stated, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting for Nokia. ***Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of published financial statements . . . .***
>
> Our management evaluated the effectiveness of our internal control over financial reporting . . . . ***Based on this evaluation, our management has assessed the effectiveness of Nokia's internal control over financial reporting at December***

***31, 2017 and concluded that such internal control over financial reporting is effective.***

(Emphases added).

49.     Notwithstanding these statements that Nokia's internal controls were effective, the 2017 20-F contained merely generic, boilerplate representations regarding the possibility that, because of "inherent limitations," Nokia's "internal control over financial reporting may not prevent or detect misstatements," and "projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions," or deterioration in the "degree of compliance with the policies or procedures."

50.     Appended as exhibits to the 2017 20-F were signed SOX certifications by Defendants Suri and Pullola, certifying that the 2017 20-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "[t]he information contained in the [2017 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

51.     The statements referenced in ¶¶ 23-50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Alcatel maintained insufficient internal controls and was materially non-compliant in its business practices; (ii) Nokia had failed to conduct adequate due diligence into Alcatel prior to its acquisition; (iii) subsequent to the completion of Nokia's acquisition of Alcatel, the Company maintained insufficient internal controls over the integration of Alcatel's businesses; (iv) as a result of the foregoing, at all relevant times, Nokia was at risk of serious criminal and civil

penalties; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

52.    On March 21, 2019, Nokia filed its Annual Report on Form 20-F with the SEC, announcing the Company's financial and operating results for the fiscal year ended December 31, 2018.  The 2018 20-F disclosed that there were certain compliance issues at the former Alcatel business, which have prompted the Company to launch an internal investigation and notify the relevant regulatory authorities regarding the same.  Specifically, the full disclosure reads:

> During the course of the ongoing integration process, we have been made aware of certain practices ***relating to compliance issues at the former Alcatel Lucent business that have raised concerns. We have initiated an internal investigation and voluntarily reported the matter to the relevant regulatory authorities***, with whom we are cooperating with a view to resolving the matter. ***The resolution of this matter could result in potential criminal or civil penalties***, including the possibility of monetary fines, which could have a material adverse effect on our business, brand, reputation or financial position.

(Emphases added).

53.    Following this disclosure, the price of Nokia's ADRs fell $0.38 per share, or 6.07%, to close at $5.88 on March 22, 2019.

54.    On March 22, 2019, after market hours, Nokia issued a press release responding to the "market rumors" surrounding the March 21, 2019 disclosure.  Specifically, the March 2019 Press Release attempted to assuage investor fears regarding these issues, stating:

> While Nokia does not typically comment on market rumors, given the market reaction and inquiries related to a disclosure in the risk factors section of its annual report on Form 20-F for 2018, the company issues this statement to clarify that the specified investigation is not expected to have a material impact on Nokia. We have seen no evidence that would suggest that criminal penalties would apply in this case, and we believe it is highly likely that any penalties that might apply would be limited and immaterial.

Nokia wishes to clarify that the context of this disclosure is the risk factors section of its annual report on Form 20-F where the company lists various risks which could potentially have a material impact on it. However, the disclosure does not reflect Nokia's assessment of the expected or likely impact of the investigation on Nokia.

As noted in the annual report, to ensure complete compliance we are now scrutinizing certain transactions in the former Alcatel Lucent business. Out of an abundance of caution and in the spirit of transparency, Nokia has contacted the relevant regulatory authority regarding this review. We are proud of our reputation as one of the world's most ethical companies and this level of openness, transparency and cooperation is what you would expect from Nokia.

For audit purposes, the overall group materiality is defined as EUR 125 million as disclosed in Nokia's annual report for 2018.

55.     Despite Nokia's attempt to soothe investors in the March 2019 Press Release, Nokia securities continued to decline over the next few trading days, falling an additional $0.19 per share from its close price on March 22, 2019, or approximately 3.23%, to close at $5.69 per share on March 28, 2019.

56.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Nokia securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Nokia securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Nokia or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Nokia;

- whether the Individual Defendants caused Nokia to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Nokia securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

63.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Nokia  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Nokia securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

64.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

66.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Nokia securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Nokia securities and options at artificially inflated prices.  In furtherance of

this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Nokia securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Nokia's finances and business prospects.

70.      By virtue of their positions at Nokia, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Nokia, the Individual Defendants had knowledge of the details of Nokia's internal affairs.

72.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Nokia.   As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Nokia's businesses, operations, future financial condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Nokia securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Nokia's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Nokia securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73.     During the Class Period, Nokia securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Nokia securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Nokia securities was substantially lower than the prices paid by Plaintiff and the

other members of the Class.  The market price of Nokia securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

74.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

76.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     During the Class Period, the Individual Defendants participated in the operation and management of Nokia, and conducted and participated, directly and indirectly, in the conduct of Nokia's business affairs.  Because of their senior positions, they knew the adverse non-public information about Nokia's misstatement of income and expenses and false financial statements.

78.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Nokia's financial condition and results of operations, and to correct promptly any public statements issued by Nokia which had become materially false or misleading.

79.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Nokia disseminated in the marketplace during the Class Period concerning Nokia's results of operations.    Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Nokia to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Nokia within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Nokia securities.

80.     Each of the Individual Defendants, therefore, acted as a controlling person of Nokia.  By reason of their senior management positions and/or being directors of Nokia, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Nokia to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Nokia and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Nokia.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: May 3, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*

Jeremy A. Lieberman
J. Alexander Hood II
Jonathan Lindenfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         ahood@pomlaw.com
         jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*